May it please the Court, my name is Howard Merton, and along with my colleague Paul Kassinian, we represent Thomas & Betts, the appellee and appellant in this court. Courts know that this appeal presents a large number of issues for it to decide, and in the time that I have allotted to me, and I'd like to reserve, if I could, Your Honor, five minutes for rebuttal. You can have three. All right, thank you, Your Honor. What I'd like to do is to focus the Court on the issues that Thomas & Betts believes cries out for appellate intervention. The first of those issues, and just to give you a roadmap, the first of those issues is the breach of contract claim, which was not presented to the jury, was not dismissed, was completely extant, and was never presented for resolution by the jury in this case. The second issue is the District Court's complete reversal in mid-deliberation of a critical jury instruction, where the Court originally told the jury that it could find liability under Chapter 21E if there was a denial of access, and then completely reversed field. The third one is there was another claim for $2.9 million worth of damages, which was in New Albertson's, part of New Albertson's claim as a plaintiff in this case, and again we submit to this Court that the jury never got to decide the apportionment of that claim. We don't know to this day what apportionment the jury applied to that claim. And then finally, there are a set of instructions, muddled instructions on key aspects of the 21E charge that at the end of the day changed what should be a strict liability statute into something much less, something that imports a knowledge component which simply doesn't exist, and I think everybody agrees with that, and also a quantification element, a proof of quantity of damages and contamination that I don't think exists in the statute. For the rest of it, if I have time, I'll come back on rebuttal or rely on the papers, but with respect to the breach of contract claim, I think it is undisputed that the contract claim was pled, it was mentioned in the pretrial memo, it was mentioned in interrogatory answers, it was mentioned in the opening, evidence was put on, and that breach of contract claim did not make it to the jury, even though it wasn't dismissed. The breach of contract claim quite simply contained three elements. One was regarding an interim payment issue, which was resolved, ironically enough, at the close of Thomas and Bess's case, by a motion by the defendant, New Albertsons. New Albertsons did not move at that time to dismiss the other two components of Thomas and Bess's contract claim, one of which was that New Albertsons had failed to cooperate as required by the contract and work in due haste, and the second was that for the year 2008 and 2009, New Albertsons had denied access to the north bank of the Mother Brook, which was critical for the remediation of the Middle Mother Brook. So you need there to be some evidence of breach in order for you to have been prejudiced, correct? Absolutely. So what is the evidence of breach? The evidence of breach, your honor, was substantial. With respect to the cooperation, and this is a quintessential jury question, your honor, there was testimony from several witnesses about, with respect to the north bank and whether or not the north bank should have been prioritized. If you look at the evidence, and you look at the evidence in context, and I think Judge Selye, you mentioned that you have to look at the constellation of facts, and I would submit that the argument submitted by New Albertsons with respect to this is doing exactly what that first case that you all heard this morning did, which is pick out little pieces and read them out of context. But if you look at the sum and substance of what Mr. Mitchell's testimony was, including the context. I tried to push it through, and I guess there's a piece of it in which there's a complaint that they didn't volunteer to help. That's a complete red herring, your honor. So that's not the evidence. Volunteering was never an issue in this case. So the evidence is there must have been some request for help that was rebuffed. It wasn't just, and you look to the entire context of this case, there wasn't just a request for help. There was a pending order by the DEP that this project be cleaned up. That's not the contract claim. What's that? That's not the contract claim. That order is subsumed and incorporated into the contract. So the whole context of this case was there are PCBs on the bank and in the stream bed, and it needs to be cleaned right away. And there's evidence in the record that while the construction season goes from generally July to October in 2007, what is the contractual duty, how is it breached, and what's the best evidence that there was breached specifically? Sure. The contractual duty, the contract requires, your honor, that there be cooperation and that the parties proceed with all due haste to clean up Middle Mother Brook. There's also in that contract the express incorporation of a DEP order, and that DEP order requires the same thing. It also requires that the parties make efforts to provide access and to obtain access. And so that's the contract. With respect to the evidence that supports it, with respect to the North Bank and the 2007, there's a delay in 2007, and we argue that it's caused by New Albertson's insistence that the bank be remediated on the North Bank first. And the evidence is laid out in our brief, your honor, that the people who were designing and doing the construction and doing the remediation had a different recommendation. But then I thought there was testimony from the ultimately saying, I don't know who was responsible for ultimately deciding not to do that. But that's why you have to look at this. I would submit to you that that's a jury question, your honor, because what Mr. Mitchell was saying was, I don't know who did that, I don't know why they did it. He was saying it out of frustration, and his testimony actually includes a reference to that frustration. Because his job, what he said was, my job is to get this done, and they can't get it done. Right. So if you look at the entire constellation of facts... But what would a jury be able to rely on to say that the reason it didn't happen was because of the other party who you claim breached? Mr. Mitchell testified directly and specifically that if we had done it our way, we would have finished in one season. And that was in the context of, and that's why I keep coming back to this, they picked that language out, but if you read the testimony as a whole, the context was this was an urgent matter that needed immediate attention, we were cleaning that river when it was snowing and there was ice forming. And so... Anything to weigh? Anything beyond that? Well, the other part is the access, Your Honor. Before you get to that, tell me what you make of this testimony. So Mitchell was asked if it was his testimony that the reason Thomas, I'm just quoting here, Thomas and Betts could not complete the remediation in 2007 was because of New Albertson's insistence upon starting on the North Bank and he answered, I'm not sure who made that decision and I don't know how it was made. He's asking that specific question about that specific time, Your Honor, but in the context of his entire testimony, he does say we made a specific recommendation to do this in another way. New Albertson's made a different recommendation and at the end of the day, because a gun was to our head, and this is all cited in our brief, we had to go with their recommendation. So that's the cooperation. We're supposed to do it quickly, here's a quick and efficient way of doing it. They didn't want to do it that way, ultimately with a gun to our head and the season closing rapidly, we had to do it their way. That's all in the record, Your Honor. Can you talk about access? Yeah, access is easier, Your Honor. Access, there's only two ways into the book, the North Bank and the South Bank. And I'll start with 2009 because the record is crystal, crystal clear in 2009. In 2009, there were a series of emails that started in June of 2009 where attorneys for Thomas and Betts were writing to the attorneys for New Albertson's and saying, we need access, we're not going to get it from the South Bank, give it to us. And it's a series that goes through June, July, and August. But I thought in that series, there's I'll get back to you, then I'll get back to you again, then there's serious obstacles to doing it that way. And then the record goes silent, and then eventually access is provided. Is that a fair count? No, it might be a fair count, but it's a denial of access. Remember, this is an eminent international project. But this is a breach of a contract. The fact that one party makes an unreasonable request, I'm not saying it is, but you have to agree, if I make an unreasonable request for access that's denied, I haven't breached the contract by denying an unreasonable request, have I? Well, I'd say two things, your honor. One, I'd say that is a jury question based on all the evidence that appears here. No, no, no. The jury can't decide that the denial of an unreasonable request is a breach of contract. Well, the jury can decide whether the request is unreasonable or not. But that wasn't the question. All right. You would agree that if you make an unreasonable request, that the denial of the unreasonable request is not evidence of breach? If I have to assume that the jury doesn't get to decide whether it's reasonable or not? So then my next question is, what in the record would prevent a jury to conclude that the request for access was reasonable? Because as I read it, there is a request made, there is a response that that would present serious obstacles. And I don't see anything in the record, at least in the appellate brief, pointing to something in the record that shows that the claim that it was an unreasonable request and that there would be serious obstacles was not made in good faith. I don't have the citation in my head, Your Honor, but I thought there was a reference in the brief to the fact that, and the evidence below was, that once they granted it, they raised a series of objections, which made it difficult to use that bank. Once the DEP stepped in and said, do it, we did it on the North Bank, and it was immediate, efficient, three weeks, no problems caused. And that's the testimony of Mr. Mitchell. Your Honor, so in 2009, and I would submit to Your Honor that whether or not, I go back to it because I think it's critical, whether or not those requests and the timing were reasonable or unreasonable should have gone to the jury on the full constellation of these facts, because you're looking at this, and I would submit, Your Honor, to the extent you're looking at that testimony, you're looking at it in a vacuum and not in the full context of this case, where it was apparent to everyone that speed was of the essence. And the answer to that, one of the things that was pressed at trial and pops up in a bunch of these other issues, the defendants, and New Albertsons in particular, put on an expert to talk about the delay. The delay was at the heart of this. The evidence of delay and the fact that time was of the essence cannot itself demonstrate that it would be, there would be a reasonable basis for a jury to conclude that there was  I think you have to show that there was not a good faith cooperation, and to show that, I think you have to say that denials of request were unreasonable. We are saying that, Your Honor. So that's my point exactly. What's the evidential basis for the jury to find that? The basis of the jury to find that is the existence of a cleanup order that required immediate cleanup. Yeah, but that doesn't mean that New Albertson had to agree to anything you proposed just because you said it was in the interest of immediate cleanup. There's got to be some showing that what they were proposing was unreasonable or what you were proposing was reasonable and they should have known it. Well, I would submit to you, Your Honor, that the fact that the PCBs continue to exist in the stream and are a threat of imminent release, which is why they're cleaning it up, and the only way that they can be accessed is through either the North Bank or the South Bank, and the South Bank has denied it, and they're subject to the order, is a basis upon which a jury could conclude, when everybody's screaming, we need to get this done, when a damage expert is put on that says that the delay is critical, that a jury could decide that it's unreasonable for one party who is under an obligation and an order by the DEM to proceed as quickly as possible and agreed in a contract to cooperate in the cleanup as quickly as possible. The language in the contract is with all due haste. With respect to that, I would submit, Your Honor... Do is not the greatest word for you. What's that? Do is not the greatest word for you. Yeah, I think it is in this context, Your Honor. You have to remember the context. This is all contextual. This is all based on the constellation of facts. The requests were made, the solution was obvious, the problem was obvious, the need was obvious, and there was no cooperation. So that's the... Do you want to go to the next... Before you leave the breach of contract claim, I have another question about sufficiency. I'm puzzled as to what showing of damages there was, contract damages, that could have been awarded, because you specifically refused a request for a charge on nominal damages or an invitation from the district court. I would direct Your Honor to three things. The first is the testimony of the expert, Mr. Peerdernock, Dr. Peerdernock. I think he was a doctor, I can't remember. There are a lot of doctors. But didn't Judge Young analyze that testimony in the post-trial motions and explain why he didn't think that that was a sufficient showing of damages? He did, Your Honor, but we disagree with that analysis completely. That expert was put on specifically to say two things, who caused the delay and what the delay cost. Everybody agreed there was a delay, and everybody agreed the delay cost money. The question was how much. New Albertson's put that expert on precisely to say the delay should have been done in one season, and since it wasn't, it cost $3.9 million. They wanted the jury to rely on that number to reduce our damages, because that's the damages for delay. It's perfectly appropriate for the jury to decide, well, you're right, it was $3.9 million. And that calculation was done entirely based on time. He figured out how much it would cost for one season, and then he figured out how much it would cost after that first season. And that $3.9 million is his calculation of how much it costs if you don't get it done in one season. We agree it should have been done in one season. We agree it wasn't. And we turn to him and say, you've quantified for us what that was. The other two examples I would point to, Your Honor, are there was testimony that for every week that the job wasn't done. It cost $42,000 just for the pump around. If the jury decided there was X delay that was attributable to New Albertson's, they could do simple math. And the third was that there was a simple chart of invoices. It's at 2960. And that chart of invoices lays out by date and amount what was charged. So a jury could go and add those up. And ironically, if you add them up, they come to $3.3 million for the second and the third season, which is close to Mr. Pierdonock's calculation. So I would submit, Your Honor, that there's three different ways that you could determine damages with respect to that. I've got 56 seconds, but I want to highlight the reversal of the access decision because that's critical. The main reason the judge decided he didn't have to charge on that was because the contract claim in his mind was coterminous with the 21E claim. He blew that rationale up when he changed his mind on the denial of access charge because there is, and nobody, I don't think anybody, contests that there's not a duty to provide access under the contract. There's a separate basis for denying it under the, for access under the contract. When he said there is no such basis for liability under 21E, he took those two, rifted them apart, and never charged under the contract. With respect to your challenge to that instruction, when he reversed his course in response to the jury question, the nature of your objection, am I right that your objection was you should have stuck with the first instruction? Well, we also raised in that colloquy that there was a separate duty under the contract. So, yes, we did argue that you should have stuck with that first instruction, but we also pointed out that there's a separate duty under the contract claim. With respect to the language that was then used in the instruction given, there was no separate objection to that language apart from the contention about the validity of the first instruction and the need to mention the contract. Are you, I'm sorry, are you asking we didn't object to the very specific language he used when he addressed the jury? I think that's right, Your Honor. Okay. But the substance and basis of our objection to that was laid out in writing and also presented to the court mere seconds before he gave that instruction. There was no confusion as to why we objected to that and that we objected to that change. Thank you. Good morning. May it please the court, my name is Jonathan Berwood and I represent Cross Appellant Alpha LaValle, Inc. Your Honor, we're here today asking the court to vacate the judgment below and to direct entry of judgment in favor of Alpha LaValle. Alternatively, Your Honor, if we're seeking a new trial. I've been allotted five minutes today, so with apologies, I'm going to argue with some haste. I'd like to focus on... With due haste? No, I think you should argue just with haste. I'm going to focus on two reversible errors below, both of which enjoyed de novo review, Your Honors. One would be the trial court's jury instruction on success reliability, which was erroneous on its face and prejudicial to Alpha LaValle. And the second issue would be the judge's denial of our Rule 50 motions for judgment as a matter of law on the grounds that T&B, Thomas & Betts, did not provide a legally sufficient evidentiary basis for finding Alpha LaValle liable under Section 21E5A. As to the first error, Your Honor, on the jury instruction for successful reliability, both Alpha LaValle and Thomas & Betts properly requested, on at least two occasions, a thorough and comprehensive instruction. The trial judge informed us immediately the day before charging the jury at the charge that they were essentially the same. About 20 minutes before he charged the jury the next morning, the trial court judge, before leaving the bench, said, I've changed my mind. I am going to instruct. Neither Alpha LaValle nor Thomas & Betts had any opportunity to review with the trial court judge how he intended to instruct. However, as we had both requested a comprehensive instruction, it was our position that he would give the instruction as requested. The proper instruction has five elements. Thomas, before you get to that part, just so I understand the history of this, the first time you object to the actual wording of this instruction is in the Rule 50A motion? No, it's pursuant to 51C. It's that sidebar following the charge of the jury, Your Honor. So this actual instruction at trial, before it was given to the jury, these words you objected to? No, Your Honor. We requested, and Thomas & Betts requested, essentially the same instruction. The judge said he would not give it. The instruction that was actually given with these words, because the words matter, was there any challenge? When was the first time the judge was surprised that you had a problem with the words that were used in this instruction apart from your request for that full instruction? At sidebar following the charge, we requested, we pointed out to the judge that he had omitted the first substantial, the general rule of non-liability. I see. And asked him to instruct properly. You followed the precise procedure that Rule 51 calls for. We did, Your Honor. After the judge gave the charge, but before the jury retired. We did, Your Honor. At sidebar, I know you requested that he give them the default rule, which he didn't do. Correct. Did you also separately tell him that you had a problem with the way he was describing de facto merger and implied assumption of liabilities? We did not actually de facto merger. So the first time that challenge arises, is in the 50A? Yes, Your Honor. So does that mean we then review his denial of the 50A with respect to the words he used on that question only for abuse of discretion? No, Your Honor. Why not? This is to know, because the jury instruction on its face was erroneous. And if I may finish. But if no objection to it was timely preserved, there was no Rule 51 objection, doesn't that affect the standard of review when you attempt to raise it late on a 50A motion? Your Honor, I'll refer you to our brief on this. What I will say to you is that my partner attempted to make a 51C objection as to the errors with the instruction. She mentioned that the general rule, the first element was left out. The trial court judge said, I read your instruction. And he physically turned his body to these seven other lawyers standing around him and said, anyone else? And he turned his attention to other objections. Thomas and Betts also in its brief noted that in an occasion they tried to argue one of the jury instructions and that the judge, by his conduct, precluded them from doing so. There's authority cited in our brief that if the trial judge precludes you from further advancing your 51C objection, that it is properly preserved. And that's our position here on appeal. And it's significant, Your Honor, the general rule is the general rule. It's the corporate doctrine. I refer you to Justice Souter's opinion in this court in the De Jesus v. Park case where he says that's the starting point of the analysis. This undisputed premise that liabilities do not follow an asset purchase unless you find these factors. And the fact that the jury didn't have that information available to them when weighing the evidence of success or liability means they were not equipped to properly, may I Your Honor? Yes. They were not equipped to properly evaluate that complicated question of law. And for that reason, Your Honor, we submit it was error and reversible error. Thank you. Thank you, Your Honor. May it please the court, Dylan Sanders and I represent New Albertsons and three of the so-called supermarket parties. Before I get to the contract claim, which does concern solely New Albertsons, I promised my co-defendants and I am up here for them as well. But I'd say, let's speak about a couple of other issues. Beginning with the so-called substantial contributing factor language in the instruction on causation and response cost. And to be clear, it was an instruction on causation and response cost. And not, as Thomas and Beth's brief would have it, an instruction that in any way infected the much earlier instruction on liability. And how do we know this? Well, to begin with, the paragraph begins, so now let me tell you about response cost. And it was a legally correct instruction. And even Thomas and Beth's concedes that the instruction is consistent with this court's holding in Dedham Water. It goes that it was the release of PCBs that caused Thomas and Beth's to incur the response cost. So even Thomas and Beth's agrees that that was a legally correct instruction. And it goes on, the sentence goes on then to say, in other words, that it was the release of PCBs on the banks or into the book itself that was a substantial contributing factor to the response cost. That is a legally constructed, legally accurate instruction as to response cost. And in no way heightened Thomas and Beth's burden on liability. Let me turn to the supplemental instruction given in response to the jury's request about access. It was a legally, again, a legally accurate instruction. Section 5a, Section 5a of Chapter 21e in no way makes a liability contingent upon access or denial of access. Section 5a defines the universe of persons who are liable under Chapter 21e. And the word access doesn't appear in any of that. So the judge's instruction in response to the jury's question, and the jury's question again was, assume no PCBs are being released from a property. Essentially can denial of access per se make that owner liable? And the answer is no. And there's nothing in the statute, 5a, that makes that so. Now let me turn to the contract claim. It is important that this court check Thomas and Beth's citations carefully. Mr. Merton and Thomas and Beth constantly refer to the constellation of facts. And I agree, the context is important. But it also is important about what the record says and what it does not say. And I submit that the contract issue is not a question that goes to the weight of the evidence. It's a question about what the evidence says and what it did not say. And in particular, it's about one witness. Could you address the point they made about the DEP? There's a request for access. There's the response that that would present serious obstacles to us to grant it. There's the eventual relenting and allowing them to have the access. They say, in the interim, DEP steps in and says to New Albertsons, you better do this, at which point New Albertsons then just doesn't. If the record showed that, I guess I could see how that might create a basis for an inference that the serious obstacles weren't so serious. So could you address that aspect of their argument? Right. So to be clear, the record does not say that. The record says that, and we're referring to events now from 2009. So the record is that the joint project is shut down as a result of cease and desist orders from Amtrak and the MBTA. When the project can resume in July 7th, there's still some prospect of access from the South Bank, and there's a dialogue, and it's important to understand the context of that dialogue. Remember, the interim agreement, the bank stabilization agreement, the contract at issue here, does not define specific means and methods or a timetable for implementation. It leaves that up to further discussions among the parties and their respective consultants. So we submit that all that's happening between July and September, when we ultimately agree to allow access through a busy supermarket over the North Bank, is that the parties are engaging in those bargain-forward discussions, and that there is no evidence whatsoever of bad faith. And I just want to clarify, at no point did DEP step in and say you had to do this. DEP was brought in by New Albertsons to mediate the access agreement that was ultimately entered into. Let me switch to talking about damages. The $3.6 million number that was thrown out by Mr. Piernot, I'll say two things about that. One, Judge Young did analyze that claim, and he found that Thomas and Betts' argument, and this is the trial judge, remember, who heard all of it, twisted that testimony out of all reality. And I submit that that is the case. But setting that aside, Mr. Piernot was talking about the delay cost associated after 2007 from the Mill-Motherbrook and Lower-Motherbrook projects not being completed, or the Mill-Motherbrook project not being completed at that time. He was looking at it in isolation, because his only opinion was about what would have been reasonable and what were the necessary and appropriate response actions for Mill-Motherbrook and Lower-Motherbrook. He was looking at it in isolation from the Upper-Motherbrook project, which only Thomas and Betts was responsible for. So the numbers that he threw out did not have to take into account costs that T&B would have incurred in any event for their Upper-Motherbrook project. And I submit that that's relevant because the measure of damages in a breach of contract claim is put the party back in the position that they would have been in. So Mr. Piernot's testimony can be employed as a stand-in for damages that Thomas and Betts actually never put any evidence in. As for their $42,000 a week number, that again is for a stream diversion system that was necessary for their Upper-Motherbrook project. And as for these packages of invoices, there was no testimony whatsoever from Mr. Mitchell about which of those invoices constituted costs that could have been avoided but for the delays. And I'll submit in closing on the contract issue, there's a reason that this is a gaping hole in Thomas and Betts' claim and argument. They failed to call the witness that they promised they would call, Mr. Geiger, in their opening. He was the witness who was carrying the water on the contract claim. He was the witness that they promised the jury that they would call to speak about these issues, not Mr. Mitchell. When they didn't call him, I submit that that left a gaping hole in their case. Could you address the inconsistent verdicts argument? And so, yes. As you know, it's an alleged inconsistency. We don't think it's inconsistent. It's an alleged inconsistency. What's the theory by which you're not responsible for the mess that has to be cleaned up, but you have to pay 25% of the response cost? We simply... So in Question 1, we're found not to be a person liable to Thomas and Betts. We're always a party liable to the Commonwealth under 5A, right? But you can be liable to the Commonwealth without having caused a release or... Correct. And that's the simple answer. But then how come you're responsible for 25% of the response cost? What's your theory about what the jury was thinking that would have made you responsible for 25% of it when you weren't the cause of any of it? So two responses, and they'll be a factual one. Here's the legal one. We simply didn't carry out a burden of proof to say that Thomas and Betts... But since they're the only ones who could have caused the mess, because they're the only ones found to be liable for causing a release, having a property that caused a release, and you weren't, that doesn't move me on that much in explaining how come... So equitable shares, there's a variety of factors that... Equitable share. Causation is simply one of those. So if I put that one aside, what is the basis then for you to have 25%? So a hypothetical basis, and we can't get inside the jury's mind, but a common sense is that the jury was allocating New Albertson's response costs for New Albertson's consultants for cleaning up primarily the North Bank, and the jury could also have seen that New Albertson's got the benefit of that, because it cleaned up the property... Does any authority suggest that benefit to New Albertson's is a consideration? I'm not saying that... It's one of the so-called war factors. Benefit to the party is one of the war factors? Yes. Can I just ask you, is it possible that they could have thought delay was one of the reasons? We submit no, based on the record. If the record... Is there a way in which delay could have been a basis for it that would not undermine your argument about the contract claim? You get the question? I do. I think there is. Could you explain it to me? The jury could have found that for reasons that had nothing to do with New Albertson's, and there were many, that the delays increased the cost of the project, and that New Albertson's, because it operated the North Bank, should have borne a share of that. Well, couldn't the jury have... I mean, I'm just hypothesizing, but I suppose the jury could have felt that New Albertson proceeded with all due haste, satisfied its contractual obligations, but could have proceeded faster, and therefore should be trimmed back on the equitable allocation. I would accept that. If you do, the thing that just makes me a little worried, if that was the theory, is that it's kind of awfully thin for us parsing the evidence about whether there was enough evidence for a jury to find on the contract claim. You see what I'm saying? Yes, it's just unreasonable for any jury to find that there was a kind of delay that could support a contract claim. But we've got this problem with them trying to reconcile the verdicts, and the most natural way to reconcile the verdicts that I can think of would be the jury might have thought, well, New Albertson caused a delay, so that's why they get 25%. But I think it gets pretty fine to say, well, I can reconcile them that way, but the kind of delay that the evidence would support that might support the verdicts isn't the kind of evidence that we could think a jury could reasonably rely on to support the contract claim. I understand, but that is not the standard. The standard is not what is the most natural way to reconcile the verdicts. We could debate that. The standard is, is there any reasonable way that these verdicts can be reconciled? And I submit that simply, New Albertson's, the simplest one, and to me the most natural one, is that New Albertson's did not carry its burden of proof of saying that Thomas and Betts, for whatever reason, needed to bear 75%. That would be true with respect to the discrete claim of inconsistent verdicts, but I think Judge Barron's question is a little broader than that. What is it likely that the jury did? And it may go to the contract claim. Why doesn't it? I'm not sure I follow that. I'm just not sure I follow what Your Honor is driving at. If it's a discrete claim of inconsistent jury verdicts, of course we hypothesize how could the jury have come up with what it did. But if you look at all the evidence in this case, the suggestion is that actually the more reasonable, the more likely reason that the jury gave you the haircut was something that would have supported the contract claim had it gone to the jury. What's wrong with that thought? Because it assumes facts that are not in evidence. It assumes that there is evidence of New Albertson's bad faith in engaging in the very discussions that were called for in the interim agreement. It would be one thing if the interim agreement required particular means and methods, but it's that if you have a disagreement about means and methods, about implementation, about South Bank versus North Bank, engage in a discussion, get the input of the joint LSP. Maybe the burden of proof point helps you on the delay point. Maybe the burden of proof point helps you with respect to the delay as a way of solving this problem. They couldn't carry their burden of proof in showing that their delay didn't cause some of the cost for purposes of the allocation between Thomas and Betts and them. But with respect to the contract claim, burden is on Thomas and Betts to prove your bad faith. Correct. And there wouldn't be enough evidence in the record to support them carrying that burden. I submit there is none. Thank you. Thank you, Ron. Good morning, Your Honors. John Harding on behalf of the Boston Renaissance Charter School, which is the owner of the 1415 High Park Avenue property purchased in September of 2008. The charter school is asking that the court vacate the judgment that was entered against the charter school on the finding made by the jury because there was not legally sufficient evidence to support that verdict. There are three simple points as to why there was not a legally sufficient basis in the record for the jury to find the charter school liable. First, the release at issue, the release in question, happened before we got there. Secondly, the release was substantially cleaned up, not entirely but almost cleaned up, before we ever got there. And third, there was no evidence at trial that after we got there we caused or contributed to any new release of PCBs to the banks or the stream bank on Mother Brook. Suppose we disagreed with you on that last point. What happens in a situation in which the charter school was found to have been causing some release? Is it your contention that it's possible for that to be true but you still have not been responsible for the release in question? Yes. Can you just tell me how the scheme is supposed to work in that situation? So party A is found by DEP to have caused a mess and then they have to clean it up. So they're in the midst of cleaning it up. While they're in the midst of cleaning it up, party B starts adding to the mess. Party A is still responsible for cleaning everything up and returning it basically pristine. But they run into a problem because party B is now putting more PCBs in. Your position is they can't go after you, party B, for the new mess that's being created because that's not the release in question. That's not exact. That is not. That's not your view? No, that's not our position. Could you explain what the significance of the release in question point is if that's not the point? So under your scenario, if party B is putting new PCBs into the stream banks or stream bed and party A has to clean those up in order to meet the standards of DEP or in this case EPA was also involved, if they have to actually do response costs and make a claim for those response costs, that's a different scenario. But that's not what we have here because there was no claim or contention by Thomas and Betts that after they cleaned up the stream bed and stream banks to the standard. As I understand it, the problem is they're never going to be able to fully clean it up because while they're cleaning it up, the other party is dumping stuff in. So it's like a Sisyphus. They can never do it. Right. Every time they clean something up, the new guy is putting stuff in. But it's not the release in question because it's a new release. What's supposed to happen in that situation? Because that sounds like what we might have happening here. Right. I don't think on the record it is what happened. But that's because you don't think you're causing anything. No, even if you are. Let's just assume for a moment that we are causing some new release of some minute quantity of PCBs. First of all, the standard imposed and agreed to with DEP was that for the stream bed and the stream banks, anything below 2.7 parts per million was okay to leave there. Let's assume you're over that. If we're over that, and they have to take some action... But that's not what you say that. I'm trying to figure out why would they have to take action. DEP ordered them for the release in question to take action. Yes. This new release is not the release in question under a theory. That's correct. So they don't have to take any action with respect to it. But they'll never be able to clean up the mess they are responsible for cleaning up, because you keep putting new stuff in. What's supposed to happen? That's what I don't understand. Well, they cleaned... then there would be an... if there was some ongoing problem, then whoever detected that problem would have an obligation to report it to DEP, and DEP would issue an order requiring a cleanup. And that did not... And they would determine who had to pay for it. And that did not happen here. And that did not happen here. And you're saying because that did not happen here, it doesn't really matter even if you were, as I'm positing, this secondary subsequent releaser of PCBs into the stream. They still cannot recover for you for the cost of responding to the release in question, because that's just a new release, and it's on them that they didn't notify DEP about that second release. Is that the idea? Correct. And they didn't spend a dime on it. Is there any authority that addresses that situation? I have not found a case that deals with that situation. So you guys wrote down the text of the phrase release in question. Release in question. And it specifically says, the statute, both under... well, under 5B, second paragraph, it says, you know, the whole premise of this is that you're an owner that comes innocently to this property and didn't have anything to do with the release that's either... It's possible that the cleanup would not have started. There could be a situation where it's discovered after you get to the property that a release has happened. It has to be cleaned up. But it's established that you weren't the owner of the property at the time that release happened. So under that sort of scenario, unless you... The statute, to me, is clear that unless you're contributing to the release... But we don't have any guidance, though, from DEEP. The worry I have about your interpretation is just whether it makes it really difficult to have a single responsible party for cleaning up a mess and whether this is going to complicate the process so much and diffuse responsibilities so much it's going to undermine the statutory scheme. I take it we don't have DEEP's views on any of this. No, and I don't see how it would. Because if there was proof that we caused a second release and it was significant enough to be a... you can have a release... But what's going to happen is they're going to have to stop in the middle and have a big fight with somebody about this secondary release. And if your second release contributes to the original mess, it seems to me if that occurred in a federal cleanup under CERCLA, they would be able to proceed to clean up the whole thing and hold you liable for contribution for your share of the total mess that was cleaned up. Now, here's a state statute with no precedent but that we know is modeled on CERCLA. If they incurred... I would not be disagreeing that if they discovered that there was some ongoing release after we got there and they took action about it, not necessarily even whether reporting to DEEP but saying, look, you recontaminated something... What if the action is responding to it? And then they want to have you pay the response cost. You're saying that doesn't count. No, I'm not saying it doesn't count. Well, that's what happened here. They responded. They responded, but they're not charging you for the cost of that response. They're trying to charge me for the cost of cleanup, the original release. No, for 1% of that, which is some equitable allocation of the degree of your response, the degree of your contribution, compared to everything else that's worn to causing the mess. But they didn't show that we caused any of the mess that they cleaned up. That's just the point. That's the key point. But that's the point that raises what Judge Seller and I have been worried about, which is you're now disaggregating. I understand why you're doing it. I understand the text gives some support to your position. I'm just saying that, practically speaking, it does create a bit of a policy problem. Well, if there was a new mess and they could link it to us and they had to spend dollars to clean up the new mess, they would have a new cause of action against us for that. It doesn't mean that they necessarily have to precisely quantify exactly how many drops. Okay. I've heard the point enough times. Thank you very much, Your Honors. You're welcome. Good morning, Your Honors. May I please look forward? My name is Eric Klein. I represent Appellee Alice Schulner's Energy and Cross-Appellant Siemens Industry. And if I may, I'll use my two minutes today for Siemens Cross-Appeal. This appeal is conditional. The court only needs to decide it if this case is otherwise reversed on an issue that undermines Siemens' credible verdict. And if that happens… What's the issue that could do that? Can you identify the issue that you think, if you reversed it, would make your appeal something we had to deal with? The only one is the substantial contributing factor instruction, Your Honor. And if that happens, then this court should interpret the unambiguous contract between Alice Schulner's and Siemens' and direct the entry of some judgment for Siemens' because no party here had standing to sue Siemens under that contract. Now, Siemens is the only party that did not own or possess property at issue in this case. We're here today because the trial court below ruled before trial that Siemens was a successor to Alice Schulner's and its Chapter 21 liabilities. But our argument boils down to this. Even if Siemens was a successor in 1978, successorship under these circumstances need not be permanent because the assumption of liabilities that that successorship would have been based on, that need not be permanent. And it wasn't permanent here. Assumption of liabilities is not irreversible. It's just an arrangement of liability by contract. It's one of multiple possible arrangements. Like any creature of contract, it can be undone by contract. An arrangement of liability can be rearranged, and it was rearranged here in 1989 when Siemens and Alice Schulner's entered into a new agreement that ended that assumption of liability. And since Siemens was no longer assuming that liability, Siemens was no longer Alice Schulner's successor. Nothing stops the parties, two parties that still exist, from deciding that one no longer needs to be the successor of the other. Siemens was then just an indebter, and these parties were not then entitled to sue Siemens. Thank you. Perfect timing. May it please the Court. Neil Hartzell on behalf of Jeanette Yukon as General Partner of the Yukon-Hyde Park Limited Partnership. We are asking this Court to affirm the jury verdict of finding of no liability as to Yukon. Apart from the absence of any developed appellate argument in Thompson Betz's principal preface to Yukon, there was no evidence of any use, storage, or disposal of PCBs by Yukon during the time that it owned the property from 1989 to September of 2008. Nor is there any evidence that Yukon caused or contributed to any PCB release. And without that, all the other claims fall away. Team B never proved when a release occurred from the 1415 property. Without that, they can't claim that we're responsible for anything. And the jury was within its rights to believe the evidence or disbelieve the evidence. They had one expert. The expert did not specify timing or when anything came from our property. And for those reasons, the verdict should be affirmed. Thank you. Thank you, Your Honors. May it please the Court, my name is Carolyn Miller. I represent Dampney Company in this case. And I'm here this morning to ask you to affirm the jury verdict and judgment in favor of Dampney. The only alleged error that Thompson-Betts cites in the appellate record, which would in any way affect the verdict in favor of Dampney, is the substantial contributing factor issue, which Attorney Sanders has already addressed for the Court. And I would just point out further for the Court that there is no evidence of any prejudice with respect to that instruction for Dampney, as Dampney did not make a de minimis defense argument. And I would direct Your Honors to the totality of the argument cited at JA02281, which is cited in part in Thompson-Betts' brief, but I think it's important for the Court to see that it's not a de minimis argument. Your Honors, Dampney is entitled to the finality of their judgment in this case, and I'd ask you to affirm the judgment. Thank you. Thank you. Mr. Martin, anything else? Thank you, Your Honor. I'll try and move quickly. With respect to the arguments of Alpha LaValle. Good luck. Sorry. I just said good luck. All right. Thank you. With respect to the arguments by Alpha LaValle with respect to the jury charge, I agree, and we've outlined in our briefs why we believe that jury charge objection was waived and not preserved. But I also would like to point out the substance of what we're arguing about. The only thing that Thomas and Betts argued with respect to successor liability with respect to Alpha LaValle was implied succession, applied assumption of the liabilities. And with respect to that, what Alpha LaValle had asked for in its instruction was to prove an implied assumption of liability, plaintiffs must prove that the successor corporation intended to assume the predecessor corporation's liability. What the judge said in his instructions was as follows. No one single factor is necessary or sufficient. You must determine the substance of the agreement of the parties. Is it implicit that Alpha LaValle would succeed to the legal obligations of American Dole? They're substantively the same. So with respect to the only successor liability argument that was made, the instruction was sufficient in exactly what Alpha LaValle asked for. With respect to, and I'll jump into what I think is the crux of what some of the court's questions are. Your Honor asked about the inconsistent verdict. You've got a finding of no cause of contribution, but you've got 25%, not one or two, 25%. Could that be delay? And I think Your Honor hit the nail right on the head. And one of the indications of that is the timing of the juror's question. The juror's question came right at the end. The juror's question only applies, if you look at it, to the delay issue. And the only people that it applies to are BRCS, UConn, and Newell Albertsons. That question is directed at those parties, and that party then gets tagged with 25%. And so these things tie together, Your Honor. The argument that that apportionment could have been because the banks got better, that request was never asked. That factor was never mentioned with respect to requesting jury instructions. It was never mentioned in the jury instructions. So that's just a complete post hoc rationalization. And then finally, Your Honor, I heard a couple times where the court asked or counsel mentioned, where's the proof of bad faith in the contract? And I just want to go back and say, I don't think the standard here is bad faith. For a straight up contract claim, and there's clearly questions about whether the jury had questions about delay. For a straight up contract claim, you don't have to prove bad faith. I don't think the intimation was you have to prove bad faith in the abstract. I think it was that the contract provision required the parties to cooperate in good faith and in due haste. Right. So the breach of that obligation would require a showing either that the failure to cooperate was in bad faith or too slow to be regarded in due haste. I think that's the argument. Respectfully, if I may, Your Honor, I think that's exactly opposite. I think to the extent that the contract requires a showing of good faith in cooperation. If you can put on evidence that they did not act in good faith, that's a much different standard than did they act in bad faith. If the contract required that they act in good faith, that's the standard we would have had to met. And in the entire context of what was happening here, to say that not allowing us access in 2008 or 2009 after inquiries is not an exercise of good faith. And that's all we needed to show. And the jury clearly had questions about it. And you put together the breach of contract not being sent, the delay instruction being reversed in midfield, and the inconsistency of the verdicts. And there's a very, very serious question as to what went on in that trial that needs to be fixed. Thank you very much. Can I ask you about the prejudgment interest point? Could you just address that? Sure. That's a simple argument, Your Honor, and I think it's a light switch. To the extent that there was a contract in place that said that, and we gave them certain things in that contract. We gave them our equipment, we gave them our contract, and we gave them our permits. And in return, they stepped in and proceeded, and we had an interim payment position. Our argument is that while those interim payments were being made and while that contract was in place, they shouldn't be getting prejudgment interest. And what do you make of the fact that in that contract they reserved their right to then make the arguments about response costs? So didn't that impliedly suggest that if they could then show it was response costs, they'd be able to get the interest on the delay? Well, I think the two provisions are in conflict, Your Honor. One says you pay on the interim basis. And at that point, since we're entitled to that payment and we're entitled to that money up and until then, I don't think it necessarily follows that you're entitled to prejudgment interest at that point. You don't make an argument that rather than getting the full prejudgment interest on the full amount, they should have only gotten prejudgment interest on some amount that would discount for the benefit of the right? I'm sorry. I'm not sure I followed. Thank you, Your Honor. I'm sorry. Okay. Can I indulge the court because I think there was a fair amount of extra time given to just address one other point, which was the point raised by Mr. Harding on behalf of BRCS. And what is the citing question? In our estimation, the citing question is defined by where we have to clean. And where we have to clean is the banks. And what do we have to do? We have to clean it to the limits that are defined by the DEP. That was our goal. That was what we thought we had to do. That's what the DEP thought we had to do. And in that context, the arguments raised by Mr. Harding I don't think carry the day. Thank you all. We'll do our best.